Mr. Justice Walker delivered the opinion of the Court. The material facts deduced from the record are, that Herró and Thomas E. Wilson obtained judgment in the Crawford circuit court against John Dillard, for the sum of $3,800, with aa agreement of record that $950 thereof should be collected at the end of 6, 12, 18 and 24 months: that Paschal, who was the attorney for Wilson, held claims for collection against him, for the payment of which he took an assignment from Wilson of the first two instalments on said judgment: that execution issued thereon, which was levied^ on the estate of Dillard, amongst which were two slaves, Mingo and Anderson: that at the sale of this property, Paschal became the purchaser, under an agreement with Dillard, made with the assent of Wilson and other creditors, that he (Dillard) should have the privilege of redeeming the property within tvyelve months: that Dillard died without complying with the terms agreed upon, and thereafter an agreement was made with Wilson, extending the privilege to him; in the mean time, and before Wilson had taken steps to redeem, he hired the slaves of Paschal, and before the expiration of the hire, Paschal addressed to him a letter, urging the propriety and necessity of disposing of the slaves at once, saying that he purposed making the slaves bring $1,000, and then made to Wilson the following proposition: “Give me the acceptance of Scott, White & Co. at 8 per cent., due at six months, for $750, and you remit on the third instalment of your judgment $250, (one thousand dollars.) "As they have priority on the best property, you see the advantage I am disposed to extend to you. Now to secure Scott, White & Co., you can easily hire them the negroes for their boat, at $30 per month, and let the bill of sale be made to them, besides giving them any other collateral security you can.” This letter bears date the 7th January, 1847. On the 16th of that month, Ogden, as agent for Paschal, executed to Scott, White & Co. an absolute bill of sale for Anderson and Mingo, for the consideration of $750, which, after deducting Paschal’s account with that firm of about $104, was settled by a draft upon the terms proposed in Paschal’s letter to Wilson. Ten days after this, Paschal ratified the act of Ogden, by his written approval on the back of the bill of sale, and at the same time, the firm, by White, one of its members, executed to Wilson their covenant, reciting the bill of sale, by which the firm was bound to re-convey the negroes to Wilson, or to such other person as he should name, upon the payment of the $750, with 8 per cent, interest, and agreed that the hire of the negroes, after deducting expenses, should be thug applied. And thereupon, Wilson delivered the obligation of a steam boat Captain for Anderson and for his hire to Scott, White & Co., and in -a few days after that also delivered Mingo, in whose possession they still remain. There is much evidence tending to explain the nature of the transaction, which may be more appropriately introduced in connection with the particular acts to which it relates, as they arise in the further investigation of the case. The main question to be determined is, whether the sale of the slaves to Scott, White & Co. was an absolute sale of the property or a mortgage. Did Scott, White & Co. purchase the slaves for themselves, and as their own property, or was the bill of sale, though absolute on its face, intended to secure them against loss for the sum of money advanced towards their purchase, or for that and as security for the payment also of the debt alleged to have been due from Wilson to them? If the former, then the slaves are theirs; but if the latter, then no matter what language may have been employed in expressing the terms of the contract, it will be held and treated as a mortgage. Bright & Taylor v. Waggle & Aikin, 3 Dana Rep. 352. 2 Story’s Com. Eq. 287. Johnson v. Clark, 5 Ark. Rep. 336. Blakemore v. Byrnside, 2 Eng. 505. 1 S. M. Ch. Rep. 372. 4 John Ch. Rep. 166. And for the purpose of ascertaining the true intention of the parties, it is a well established rule, that the courts will not be limited to the terms of the written contract, but will consider all the circumstances connected with it; such as the circumstances of the parties, the property conveyed, its value, the price paid for it, defeasances verbal or written, as well as the acts and declarations of the parties, and will decide upon the contract and the circumstances taken together. Oldham v. Hally, 2 J. J. Mar. 114. Thompson v. Davenport, 1 Wash. 125. Craft v. Ballard, I S. M. Ch. Rep. 372. Hechman v. Cantrell 9 Yerg. 172. A few examples may serve to illustrate these rules, and show the extent td which the courts have gone under various stated cases. In the case of Craft v. Ballard, 1 S. & M. (Miss.) Ch. Rep. 372, it is held to be “ a well established rule upon both principle and authority, that an absolute deeed may be converted into a mortgage by parol evidence, showing that it was intended as a mortgage and that the grantor will be let into all the rights and privileges of a mortgagor.” In the case of Strong and others, Trustees of Mitchell v. Stewart, 4 John. Ch. Rep. 166, a-bill to redeem having been’filed, the contract set up was an absolute sale, alleged in the bill however to have been in fact given to secure a loan. The answer positively denied the loan. Parol proof was admitted to prove the nature of the transaction. Chancellor Kent said: “On the strength of the authorities, and on the proof of the loan and of the fraud on the part of the defendant in attempting to convert a mortgage into an absolute sale, I shall decree an existing right in the plaintiff to redeem.” In the case of Secrest v. Turner, 2 J. J. Mar. 471, Secrest let Turner have a sum of money, whereupon Turner made him a bill of sale for a negro boy’, and delivered him to Secrest; and at the same time Secrest executed to Turner an instrument in the nature of a defeasance, whereby he agreed to restore the boy to Turner, provided Turner should, by a given day, pay to him a certain sum therein named for the boy. The court said: “But in this ease there was no debt, Turner was pressed for money, Se-crest had it; he advanced it in depreciated paper, and simultaneously with the advance of the money and the execution of the bill of sale, he covenanted to re-deliver the boy on the payment of a much larger sum than he had given. Courts of Equity will be inclined to construe contracts to be mortgages rather than sales, whenever their real character may be doubtful; ” and accordingly decided this contract a mortgage. In the case of Oldham v. Hally et al., 2 J. J. Mar. 114, where an absolute conveyance for lands was made and the consideration paid in cash, with a defeasance to re-convey if the consideration money should be repaid within twelve months with interest thereon, the court said: “ The first question for consideration, and that upon which, in a great degree, all others depend, is the true nature of the contract set out. Is it a mortgage or is it a sale upon condition ? The solution of this question when it occurs, depends upon the circumstances of each case and the sound discretion of the court.” We might multiply decisions establishing the rules which require that courts should look to all the circumstances connected with the contract,in order to determine its true character, but these may suffice. The case now under consideration is in several respects different from any that we have found reported. Here the legal title to the slaves was not in the assignee of the complainants, who occupies the equitable ground of a mortgager seeking to redeem, but the defeasance was made directly to such assignor: and from the evidence it would seem that the price paid for the slaves was $1000, $250 of which were paid by Wilson, the assignee of the defeasance, and $750 by Scott, White & Go., to whom the bill of sale for the slaves was made. These peculiar circumstances as well as the fact that the written defeasance, which was assigned to the complainant and under which he claims, is of a different date from the bill of sale, involves this case in more than ordinary difficulty. In the first place, who was the real purchaser of these negroes? To whom did Paschal in fact sell them? The solution of this question involves an inquiry into the facts and circumstances of the case. The negroes were sold as the property of Dillard, the father of Mrs. Wilson. After Dillard’s death, there seems to have been some agreement between Paschal and Wilson by which Wilson was to purchase the slaves so as to secure them to his family, but the precise terms of this agreement are not disclosed, nor under the subsequent arrangement is it a matter of importance, further than it tends to show the desire of Wilson to secure the slaves to his family. Paschal in his letter to Wilson advises him that the time has arrived when some disposition must be made of the slaves; tells him that he wishes to favor him, and proposes to sell the slaves to him for §1000, §250 to be paid by him, and §750, by an acceptance of Scott, White & Co., on time, and at the same time, suggests that he can secure Scott, White. & Co., by letting the bill of sale be made directly to them, and that they should also take the negroes into possession, and hire them on boats until they earned a sum sufficient to pay the §750, with interest. All this took place just as proposed. And here the question arises, to whom did Paschal sell these negroes? It is true the bill of sale on its face shows a bargain and sale to Scott, White & Co.: that may all be true, and yet but carrying out the agreement between Wilson and Paschal;- for the bill of sale was to be executed to them as security for the money. And it is true also that Ogden, who, as the agent for Paschal, executed the bill of sale, states that it was his understanding that the sale was to be absolute; but then when it is considered that he was but executing the directions of Paschal, and may not have been apprised of the facts of the case further than was necessary to perform the trust confided to him, (that of executing the bill of sale,) and when it is seen that, at the time that Paschal affirmed the act of Ogden by his written endorsement on the bill of sale, ho also drew up the defeasance, providing for the complete fulfilment of his proposition to Wilson, and that both Paschal and Ogden are proven to have admitted that such were the conditions of the sale, and that Scott admitted in his letter to Mrs. Wilson, that there was an understanding corresponding in terms with that proposed by Paschal, only he stated there was a private account of Wilson’s which was also to be paid, and when White, independently of his having executed the defeasance, which he asserts was done under a misapprehension of the facts, admitted that such was the contract, and promised to return the slaves in a short time; and lastly, when it is a fact admitted and proven, that Scott, White & Co. hired the negroes out on steamboats, kept an account of their hire as well as of expenses, and admitted in conversations as well as by Scott’s letter to Mrs. Wilson, the right of Wilson to see that they were kept on the boat, where they could earn the best wages. When all these facts are presented in connection with the farther fact that this whole conduct is consistent with a consummation of the purchase under Paschal’s proposition to Wilson, and that any other is wholly irreconcilable with it, can it be said that this was not a contract consummated for the benefit of Wilson? If not, why did Wilson give the credit for the $250? Why did he turn over the covenant for the hire of Anderson, as well for the hire then due as for such as might become due ? Why did he insist upon the defeasance at the time the contract was affirmed by Paschal, and before he gave up the covenant for the hire of Anderson, and why subsequently demand of Scott, White & Oo. that they should keep the negroes employed on the boat, if there was no such agreement, by which the slaves were ultimately to be his, or can it be said that Wilson would have suffered slaves to pass, absolutely beyond his reach' for $750,, when, according to the rates of hire proven, they could earn that sum in sixteen months or two years, Apart from all consideration of the written defeasance, no one can contemplate the rela-. tive position of the parties and the leading .motive which prompted Wilson to act, the securing of these family servants to the family whom they had served, perhaps, for many years, without being satisfied .that there was some understanding with him upon the subject: in fact that the purchase was made with a view to that end. As regards the defeasance executed by White, for the firm, it is objected, first, that it was executed at a subsequent date, and therefore, could not qualify the bill of sale previously executed. It is true that the bill of sale was dated on the 16th January, 1847, and that the defeasance was not executed until the 26th of that month: but whether the contract was completed or the bill of sale passed to Scott, White & Co. at its date doe's not appear, and from the after conduct of the parties, it would seem that such was not the case, for on the 26th, Paschal, by his written endorsement, affirmed the sale made by Ogden, which shows that it was esteemed necessary to submit the matter to Paschal for his affirmance, otherwise how does it happen that Scott did not retain the bill of sale, or how does it come into Paschal’s hands at that date, if the contract was complete and the bill of sale delivered up ? The cirsumstances clearly tend to prove that the bill of sale, though dated on the 16th, was held subject to Paschal’s ratification: if so, it properly dated from the endorsement of affirmance by Paschal, and delivery to White, which was done on the same day and at the same time the defeasance was executed and the covenant for the return of Anderson, and for his hire delivered up by Wilson; consequently the whole transaction is of one date; but if otherwise, the objection would not, be good. 4 Kent Com. 141. A further objection is made to the defeasance on the ground that White was induced to execute it under a misapprehension of the facts and upon the false representations of Paschal that the instrument was a mere matter of form. The deed is admit-, ted to have been executed, and the truth of the circumstanced alleged in avoidance of the defeasance becomes the subject of inquiry. It is expressly charged in the bill that “White, one of the firm of Scott, White & Co., for and on behalf of the firm executed the defeasance and delivered it to Wilson.” To this allegation, White answers that about the date of the defeasance, he was called upon by Wilson and Paschal to sign the same; that he objected to signing it for the reason that he was not pre-. sent and knew nothing of his own knowledge of the particu*. lars of the purchase of the slaves, and that by signing the de-. feasance the absolute title for the slaves might be affected: that thereupon Paschal told him that the instrument was a mere mat-, ter of form, and would not affect his title to the slaves: that Scott had agreed that the defeasance should be executed, and that .confiding in Paschal’s statement, he executed the defeasance. Upon this issue, the first question is, shall the answer of White be taken as evidence only so far as it responds to the allegation charging the execution of the defeasance, or shall the whole pf the answer in regard to the misrepresentations and inducements under which he says it was executed, be also received and weighed as evidence in determining whether the deed was in law executed or not. It is a well established rule that affirmative matter in avoidance of the allegations in the bill, must be established by evidence independent of the answer, which cannot be used for that purpose. But the point of difficulty in this and most other cases, is to distinguish between that which is strictly responsive to the allegation, and that which is affirmative of a new fact. This being a question of evidence, it may perhaps be more familiarly illustrated by rules applicable to common law issues. Here the allegation may be considered the fact to be proven and the answer tendering the general issue. In chancery, the complainant makes the defendant a witness and brings him upon the stand. Suppose the fact to be proven (as in this case) should be the execution of a deed, and the witness upon interrogatory should say, “I saw the deed sealed and delivered.” At common law, the defendant would surely have a right to cross-examine him touching any matter which might be given in evidence under the plea of non est factum. And so we apprehend the rule to be in chancery proceedings. When the defendant is called upon to answer, he may state any fact which could be given in evidence under that issue, as fully as if cross-examined for that purpose. The object to be attained (proof of the execution of the deed,) Is precisely the same in the one court as in the other; the same facts, which would establish its validity or defeat it in the one court, would also in the other; and the only difference is, that in chancery, the defendant is put upon his oath as a witness upon particular facts alleged in the bill, whereas, at common law, he would not be a competent witness. The right of a defendant to testify in a chancery case, is limited to particular facts alleged, and where the defendant admits the facts and sets up others in defence in avoidance, the answer is,'in effect, a plea of confession and avoidance, and must be proven by the defendant just as such plea at common law would. As where the answer admits the execution of a note and sets up payment. Nichols v. Daniel, Walker's (Miss.) Rep. 224: or where to a bill to foreclose, the answer of the defendant sets up usury as a. defence, the answer is not evidence for him unless the usury was the subject of inquiry in the bill, (McDaniel v. Barnum, 5 Verm, R. 279, Green v. Hunt, 1 John. R. 580:) or where the deed is alleged to have been made on a different day from that of its date, it is affirmative matter which must be proven. Breckenridge v. Ford, 3 Mon. 54: or on a plea of failure of consideration, the proof rests with the party making the defence. Higdon's heirs v. Higdon's adr., 6 J. J. Marsh. 51. And where the fact charged is the receipt of a sum of money, in order to charge the defendant with it, it has been held that should he answer that he had received the money, and had, thereupon, at once paid it over, making its receipt and payment part of the same transaction, the answer would be evidence as well of the payment as of the receipt of the money; but not so, if the payment was on a subsequent day, for that would be a different transaction. Thompson v. Termb, 7 Ves. 587. And in a case where the allegation was fraud, and possession was one of the grounds relied upon, and in regard to which the defendant was called to answer, it was held that the answer was evidence, as well of the explanatory circumstances connected with possession as of the fact of possession, for it related strictly to the point at issue, the fraud. Eastman v. McAlpin, 1 Kelly's (Geo.) Rep. 170. Without further references to adjudicated cases, as showing forth the true rule in the case before us, wc will proceed to its examination. The fact to be proven was the execution of the de-feasance. The defendant says, “I did execute it, but I did so under a misapprehension of facts and of the legal effect of the instrument.” Suppose this to have been a case at common law, and the witness had been called to prove the execution of the deed. After stating that he witnessed its execution, could he be interrogated upon cross-examination as to the misrepresentations of the obligee at the time of his making the deed? If so, for what purpose? Surely for no other purpose than to show that it was obtained by fraud, and without any real assent of the mind* Stark. Ev., vol. 2,p. 479. All that White then could say, even if called, as a witness, would be that he knew nothing of the contract himself, and that Paschal told him it was in accordance with that set out in the defeasance; for suppose he should add “which I afterwards found to be false,” that would only be hearsay, as he admits that he knew nothing of the contract himself. The falsehood of this representation was then an affirmative matter about which the defendant did not know, (or if he did, it was no fraud upon him,) and which must necessarily be established by other evidence. Looking then into the record for this further evidence in order to affect the deed with fraud, against the contract itself and numerous circumstances all tending to prove that such was the contract, there is the deposition of Ogden, who gained his information of the matter touching the agreement with Scott from Paschal, and acted under Paschal’s direction in making the deed, and therefore his evidence in regard to the terms of the original agreement between Paschal and Scott, was but Paschal’s statement, and was not necessarily inconsistent with his proposition to Wilson; for it was by the terms of that proposition intended that the bill of sale, on its face, should be absolute, but nevertheless, for the purpose of securing Scott, White & Co., for the advance of the $750, so to be made by them. It is true that Scott, in his answer, says the sale was absolute and unconditional, but he admits that before Ms bill of sale was executed, he was informed by Paschal that his price was $1,000, and that if he, Scott, or the firm would advance $750, that he could arrange the balance with Wilson; he also conferred with Wilson on the subject of his, .Wilson’s, right to redeem, but says that no terms were made or entered into. By his letter, however, to Mrs. Wilson, he admitted that there was an agreement entered into substantially, indeed almost literally, such as contained in the defeasance, only that according to his version of the affair, there was a debt due from Wilson to them to be paid, as well as the sum advanced for the si aves, before they were to be given up, and in addition to these facts, when we consider the use of the slaves, hiring them on the boat and keeping an account of their hire, expenses, &c., conduct which can only be explained or reconciled upon the ground that such defeasance did actually exist and that Scott, White & Co. were acting under it. Let it be remembered, too, that ample time was allowed for 'White to communicate with Scott, (and it is but fair to presume that he did so, they being partners, and this a partnership transaction,) and yet, we hear of no objection being made, but on the contrary, Scott, by letter, and White, by his conversations with Mrs, Wilson, and the firm by their use of the property and the manner in which they kept the accounts, substantially affirmed the defeasance. And as regards the verbal statement of Scott, in his letter to Mrs. Wilson of the additional item of claim which was also to have been paid, and White’s declarations as to his understanding of the matter, the written contract concludes the parties from any reference to them, as part of the contract, so long as the written contract exists, for a contract cannot rest partly in parol and partly in writing. When a contract is once reduced to writing, it is to the writing- alone that we must look to ascertain what the contract really is. Powel on Cont. 250. 3 Stark. Ev. 1008. Randall v. Phillips et al., 3 Mason 383. Black v. Bowman et al., 4 Eng. 506. The case reported in 3 Mason, is, in many respects, like this. In that case, as in this, there was a deed with a defeasance, which was assigned, and upon suit brought by the assignee to redeem, the defendant set up as a defencé that there was another account not embraced in the defeasance which was also to have been paid. The opinion of Judge Story upon the above state of facts is so clear and so much in point, that we will extract so much of it as relates to this particular question. He said: “So far as the answer in this case sets up new facts by way of discharge or avoidance of the matter of the bill, or alleges separate and independent agreements, they are not evidence for the defendant ; but all such allegations must be substantiated by proof aliunde. This is the general -doctrine in equity, and is not now susceptible of any real doubt. There is also an allegation in the answer of the defendant, “ Jeremy Phillips,” of an independent oral agreement previous to, or at the time of the execution of the conveyance and defeasance in 1792, that he should hold the estate as security for the payment of an account due him, &c., beyond the terms of the agreement in the defeasance. As to this point, it is sufficient to say, that no parol evidence can be admitted to vary or contradict the terms of that agreement, and therefore, the case must stand upon those terms, and the rights of Phillips be adjudged accordingly.” And so we say in this case, that so long as the written contract remains, (and we have said that the proof in this case was not sufficient to set it aside,) neither, the statement of Scott in his letter to Mrs. Wilson, nor any other parol evidence, can be admitted to vary or qualify the terms. This letter of Scott’s is important to show that there was a verbal agreement in regard to the defeasance at the time the contract is made, and, in this respect, differs materially from his answer, with the single enlargement of the terms to embrace another debt. As in the case in 3 Mason, it is a substantial admission of the defeasance, and also-of the rights of Wilson to see the slaves put to hire on boats under it, and this too after, it is but fair to infer that he was apprised of the acts of White, his partner, who also, according to the evidence of Mrs. Dillard, which stands unimpeached, admitted the defeasance, and promised soon to see that the slaves were restored to Wilson. However this may be, in weighing the evidence, the rule is well established, that in doubtful cases, the court should construe the contract to be a mortgage rather than, an absolute sale. Thus in the case of Edrington v. Harper, 3 J. J. Mar. 353, where, to an absolute deed there was a defeasance that if the party choose to pay the sum of $312, the consideration money, with 6 per cent, interest by a given day, that the contract should be canceled, and that it was optional with the parly to whom the defeasance was executed, whether he should pay or not, it was held to be a mortgage. The court in their opinion saying, “ In all doubtful cases the law will construe the contract to be a mortgage, because such construction will be most apt to attain the ends of justice, and prevent fraud and oppression.. In the case of Johnson's exr. v. Clark, 5 Ark. 340, this court in distinguishing between conditional sales and mortgages, said, “ In this case, the form of the conveyance is absolute; no security is taken for the money; no interest is stipulated for, nor is there any reservation made as to hire; and cited Conway’s exrs. v. Alexander, 7 Cranch Rep., with approbation.” In that case, the court said: “ Had there been any treaty, any conversation respecting a loan or a mortgage, the deed might, with more reason, have been considered as a cover, intended to veil a transaction, different in reality from the appearance it assumed; but there was no such conversation.” It will, at once, be perceived, that the case now before us, furnishes nearly all the distinguishing features which the case of Johnson’s exrs. v. Clark, lacked to make it a mortgage. Here the defeasance expressly provided for the payment of the sum advanced by the hire of the slaves. It stipulated the rate of interest; it provided for the hire of the slaves, and how their time should be employed; and the payment by Wilson, of $250 of the price asked for them: and the rates of hire, contrasted with the sum advanced by Scott, White & Co., show clearly an inadequacy of price Viewed in any aspect it may, this case bears the well defined evidences which fix its character as a mortgage, and, as we have remarked, although the evidence is not absolutely conclusive, still, under the uniform rules of courts of chancery, we must treat this contract as a mortgage. It is objected, however, that as this contract was made with Paschal, although the defeasance was made to Wilson, Paschal alone having had the right of property in himself, the right to redeem alone exists in him. It is true, as a general rule, that no person can come into a court of equity for a redemption of a mortgage, but he who is entitled to the legal estate of a mortgagor, or claims a subsisting interest under him. 1 Powell on Mort. 343, 381, 382. .But it is equally well settled, that an assignment of a mortgage vests in the assignee the right to redeem. Skinner v. Miller, 5 Littell 84; or one to whom a bona fide transfer of the mortgagor’s estate is made may redeem the property; and the same rule extends to persons having any substantial interest in the property. Jeremy's Eq. 184. In the case before us, Paschal did not assign over his right of redemption, but according to the terms of the agreement, Scott, White & Co. made the de-feasance directly to Wilson, by which he was secured in all the equitable rights which Paschal could have had. They were, moreover, trustees to Wilson to the extent of the purchase money advanced by him. As in the case of Swan v. Ligen, 1 McCord's Ch. Rep. 231, where it was held, “that if one buys an estate in personal property, with a knowledge of the fact that the remainder is vested in a particular individual, he comes as a trustee for such individual, and may, under the circumstances, be compelled to give security for the forthcoming of the property.” So, where one advances money, but the title is taken in the name of a third person. Brown v. McDonald, 1 Bill 306. And such was the state of the case before us as to part of the consideration: indeed, from the whole transaction, it is not very clear but that they held the whole legal title in trust for the benefit of Wilson. So far as a question could arise out of the facts set up in the answer, that Wilson was indebted to Scott, White & Co. in a further sum on account of individual transactions with the firm, it may suffice to say that it was affirmative matter which required proof, first, that there existed such indebtedness; and, secondly, that it was embraced and provided for in the defeasance. Upon neither of these points is the evidence sufficient. The paper purporting to be the transcript of a judgment in their favor, attached to the answer of Pennywit, is not authenticated or proven in any manner: nor is it noticed in the bill of exceptions as part of the evidence in the case. If it is true, that there is such debt in existence, upon a cross-bill setting up the fact and the circumstances of Wilson, and the extent and nature of the purchase by complainants, we will not say but that they might have held the property subject to pay the debt, so far as it might be available for that purpose, after satisfying the complainants’ prior equity; but in the present aspect of the case, we have nothing to do with this question. Entertaining the views which we have expressed upon the several questions presented by the record, it follows that we concur in the decision of the court below in deciding that the instrument executed by Paschal to Scott, White & Co., was, in truth, but a mortgage to secure the payment of the money advanced, with the interest thereon. There was, therefore, no error in the decree of the court below.